# No. 24-2108

IN THE

# United States Court of Appeals
### FOR THE TENTH CIRCUIT

**UNITED STATES OF AMERICA**,
*Plaintiff-Appellee*

*v.*

**MARC CANDELARIA**,
*Defendant-Appellant*

On Appeal from the United States District Court
for the District of New Mexico
D.C. No. 22-CR-767-KWR (The Hon. Kea W. Riggs)

## ANSWER BRIEF FOR THE UNITED STATES

### ORAL ARGUMENT IS REQUESTED

March 2025

HOLLAND S. KASTRIN
  *Acting United States Attorney*
  *District of New Mexico*

JAMES R.W. BRAUN
  *Assistant U.S. Attorney*
  201 3rd St. NW, Suite 900
  Albuquerque, NM 87102
  (505) 346-7274

# TABLE OF CONTENTS

**PAGE**

TABLE OF CASES AND OTHER AUTHORITIES ........................................... iii

PRIOR OR RELATED APPEALS .................................................. vii

ISSUES PRESENTED ........................................................... 1

STATEMENT OF THE CASE AND THE FACTS ............................................ 1

    A.    Candelaria obtains a $23,000 check from his father-in-law by fraud and violence ..................................................... 1

    B.    Candelaria robs a Bank of America branch and gets away with $24,000 ..................................................... 5

    C.    A bank robbery demand note is found in Candelaria's vehicle by SFPD and subsequently seized by FBI during a consent search .................................................... 6

    D.    Candelaria is charged in federal court with bank robbery and moves to suppress the demand note seized from the Jetta .................................................... 7

    E.    Candelaria is convicted of bank fraud at trial, pleads guilty to bank robbery, and is sentenced to 26 years' imprisonment .................................................... 10

SUMMARY OF THE ARGUMENT .................................................. 14

ARGUMENT .................................................................. 17

I.    The district court correctly denied Candelaria's motion to suppress ... 17

    A.    Standard of review .................................................. 17

    B.    The search of the Jetta was based on valid consent .................... 17

i

　　　　1.　*Meaghan Hennelly had actual authority to consent to a search of the Jetta* ................................................................ 19

　　　　2.　*Meaghan Hennelly had apparent authority to consent to a search of the Jetta* ............................................................ 22

　　C.　Inevitable discovery ....................................................... 26

　　D.　In the alternative this Court may affirm on either the vehicle exception or foregone-conclusion doctrine ...................... 31

　　　　1.　*Automobile exception* ......................................... 31

　　　　2.　*"Foregone-conclusion doctrine"* ............................ 32

II.　Candelaria's sentence is procedurally and substantively reasonable .. 33

　　A.　Standard of review ......................................................... 33

　　B.　Candelaria's 26-year sentence is procedurally reasonable ....................................................................... 34

　　C.　Candelaria's sentence is substantively reasonable ..................... 38

　　　　1.　*The district court acted well within its discretion in imposing a 26-year sentence* ................................ 38

　　　　2.　*Candelaria has not shown that his sentence is manifestly unreasonable.* .................................... 42

CONCLUSION AND STATEMENT CONCERNING ORAL ARGUMENT ... 50

TYPE-VOLUME CERTIFICATION ................................................ 51

CERTIFICATE OF SERVICE AND DIGITAL SUBMISSION ..................... 52

# TABLE OF CASES AND OTHER AUTHORITIES

## TABLE OF CASES

**PAGE**

*Florida v. Meyers,*
    466 U.S. 380 (1984) ....................................................... 32

*Gall v. United States,*
    552 U.S. 38 (2007) ................................................ 33, 34, 36, 39, 42

*Michigan v. Thomas,*
    458 U.S. 259 (1982) ....................................................... 32

*Nix v. Williams,*
    467 U.S. 431 (1984) .................................................... 26, 28

*Rita v. United States,*
    551 U.S. 338 (2007) ....................................................... 42

*Schneckloth v. Bustamonte,*
    412 U.S. 218 (1973) ....................................................... 18

*United States v. Bagley,*
    877 F.3d 1151 (10th Cir. 2017) ........................................ 32

*United States v. Banks,*
    262 Fed. Appx. 900 (10th Cir. 2008) ............................... 25

*United States v. Barnes,*
    890 F.3d 910 (10th Cir. 2018) .............................. 39, 42, 49

*United States v. Bass,*
    661 F.3d 1299 (10th Cir. 2011) ........................................ 19

*United States v. Chavez,*
    723 F.3d 1226 (10th Cir. 2013) ........................................ 35

*United States v. Christy,*
    739 F.3d 534 (10th Cir. 2014) ..................... 26, 27, 28, 29, 30

*United States v. Cookson,*
   922 F.3d 1079 (10th Cir. 2019) ....................................... 34, 40, 43

*United States v. Corral,*
   970 F.2d, 719 (10th Cir. 1992) ................................................. 33

*United States v. Cortez,*
   965 F.3d 827 (10th Cir. 2020) ................................................. 17

*United States v. Cos,*
   498 F.3d 1115 (10th Cir. 2007) ............................................... 23

*United States v. Crosby,*
   119 F.4th 1239 (10th Cir. 2024) ................................. 44, 45, 47, 48

*United States v. Gantt,*
   679 F.3d 1240 (10th Cir. 2012) ........................................... 34, 36

*United States v. Gross,*
   44 F.4th 1298 (10th Cir. 2022) ....................................... 34, 39, 49

*United States v. Gutierrez-Hermosillo,*
   142 F.3d 1225 (10th Cir. 1998) ............................................... 18

*United States v. Hicks,*
   116 F.4th 1109 (10th Cir. 2024) ............................................. 35

*United States v. Jenkins,*
   2024 WL 4601486 (10th Cir. 2024) (unpublished) ................. 36, 37

*United States v. Johns,*
   469 U.S. 478 (1985) ............................................................. 32

*United States v. Jones,*
   701 F.3d 1300 (10th Cir. 2012) ............................................... 18

*United States v. Kimoana,*
   383 F.3d 1215 (10th Cir. 2004) ............................................... 23

*United States v. Koch,*
   978 F.3d 719 (10th Cir. 2020) ................................................. 35

*United States v. Lente,*
   647 F.3d 1021 (10th Cir. 2011) ............................................... 37

*United States v. Lente,*
   759 F.3d 1149 (10th Cir. 2014) .............................................................. 45, 46

*United States v. Loera,*
   923 F.3d 907 (10th Cir. 2019) ................................................................ 26, 27

*United States v. Martinez,*
   455 F.3d 1127 (10th Cir. 2006) ...................................................................... 36

*United States v. Martinez-Barragan,*
   545 F.3d 894 (10th Cir. 2008) ........................................................................ 44

*United States v. Matlock,*
   415 U.S. 164 (1974) ......................................................................................... 19

*United States v. McCrary,*
   43 F.4th 1239 (10th Cir. 2022) ...................................................................... 39

*United States v. Miller,*
   978 F.3d 746 (10th Cir. 2020) ........................................................................ 38

*United States v. Pelletier,*
   700 F.3d 1109 (7th Cir. 2012) ........................................................................ 29

*United States v. Pinson,*
   542 F.3d 822 (10th Cir.2008) ..................................................................... 36, 49

*United States v. Rith,*
   164 F.3d 1323 (10th Cir. 1999) ................................................... 19, 20, 21, 22

*United States v. Salinas-Cano,*
   959 F.2d 861 (10th Cir. 1992) ..................................................................... 24, 25

*United States v. Sanchez,*
   608 F.3d 685 (10th Cir. 2010) ........................................................................ 18

*United States v. Smart,*
   518 F.3d 800 (10th Cir. 2008) ........................................................................ 34

*United States v. Souza,*
   223 F.3d 1197 (10th Cir. 2000) ................................................................ 26, 27, 31

*United States v. Valdez,*
   --- F.4th ---, 2025 WL 582593 (10th Cir., February 24, 2025) ............... 40, 42

*United States v. Ventresca,*
    380 U.S. 102 (1965) ........................................................................ 18

*United States v. Villela,*
    2024 WL 5199991 (10th Cir. 2024) (unpublished) ...................................... 47

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

<u>Statutes</u>

18 U.S.C. § 1344(2) ........................................................................ 10

18 U.S.C. § 2113(a) ........................................................................ 7

18 U.S.C. § 3553(a) ........................................................................ 13, 34, 43

18 U.S.C. § 3553(a)(1) ........................................................................ 40

18 U.S.C. § 3553(a)(2)(A) ........................................................................ 40

18 U.S.C. § 3553(a)(2)(B) ........................................................................ 41

18 U.S.C. § 3553(a)(2)(C) ........................................................................ 41

18 U.S.C. § 3553(a)(4) ........................................................................ 40

18 U.S.C. § 3553(a)(6) ........................................................................ 36

18 U.S.C. § 3553(a)(7) ........................................................................ 41

U.S. Const. amend. IV ........................................................................ 18

<u>Rules</u>

U.S.S.G. § 2A2.1(a)(1) and (b)(1)(A) ........................................................................ 49

U.S.S.G. § 2A2.2 ........................................................................ 48

## **PRIOR OR RELATED APPEALS**

There are no prior or related appeals.

# ISSUES PRESENTED

I.      Whether the district court erroneously denied Defendant-
        Appellant Marc Candelaria's motion to suppress.

II.     Whether Candelaria's 26-year sentence on his bank fraud
        and bank robbery convictions was procedurally and
        substantively reasonable.

## STATEMENT OF THE CASE AND THE FACTS

### A.      Candelaria obtains a $23,000 check from his father-in-law by fraud and violence.

Candelaria and Meaghan Hennelly got married in 2017 in Brooklyn, New York. 3R.206.[1] Due to financial difficulties, they moved with their young daughter to Santa Fe in 2019 and lived in Meaghan's parents' guest house for the next two years. 3R.205-07. Meaghan's parents gave Meaghan a key to the main house so she and Candelaria could get in the house whenever they needed to. 3R.174.

Candelaria got a job as a carpenter at Los Alamos National Labs. 3R.175. Meaghan's father, John Hennelly, and stepmother, Vicki Hennelly, loaned Candelaria $41,000 to pay off his credit card debts and back taxes so that he could obtain a Q clearance at LANL. 3R.128-29, 175-76, 211. John also set up an investment account with Candelaria so that Candelaria could

---

[1] References to the record take the form [vol.]R.[page]. Candelaria's opening brief is cited as "Op. Br." Multiple members of the Hennelly family are referenced herein; for readability and to avoid confusion, they are referred to primarily by first name.

trade options. 3R.173. John put $10,000 in the account, and Candelaria lost it all. 3R.173-74. After that, John had no intention of investing with Candelaria again. 3R.174.

Candelaria and Meaghan moved into their own home in Santa Fe in August 2021. 3R.211. Around that time, Vicki took a trip out of town. 3R.132-33. John stayed behind in Santa Fe, alone in his home. 3R.178.

John went to bed around 9:00 p.m. on September 13, 2021. 3R.179-80. Early the next morning, he was awakened by someone flashing a bright flashlight in his eyes and pointing a gun at him. 3R.180. The intruder[2] told John to open the safe. 3R.180. John tried the combination several times but was unable to open it. 3R.182. The intruder told John to lie on his stomach, and then left for a few minutes. 3R.182.

The intruder returned with John and Victoria's checkbook and a pen. 3R.183. He told John to write out a check in the amount of $23,000. 3R.183. John asked if he should make the check out to "cash." 3R.183. The intruder said, "No. Leave it blank." 3R.183. The intruder took the check, told John not to move for an hour, and left. 3R.184. Shortly after that, John felt a severe pain in the back of his head and passed out. 3R.184.

---

[2] John Hennelly testified that this intruder was not Candelaria. 3R.181.

Later that afternoon, Meaghan entered the house to check on her father.  3R.218.  She found John lying on his closet floor in a pool of blood.  3R.220.  John had been beaten nearly to death, suffering multiple skull fractures from repeated blows with a hard object, and his ears were barely attached to the sides of his head.  3R.406-09.  Based on the extent of the injuries, it was apparent that whoever attacked John had intended to kill him.  3R.411.

Vicki immediately made arrangements to fly home.  3R.135.  She was at the hospital with John when she received a fraud alert from the bank.  3R.139.  She later pulled up the check electronically on her iPad and saw that it was a check in the amount of $23,000 signed by John.  3R.140.  She noticed that the dollar amount and the signature were in John's handwriting.  The payee was Marc Candelaria and the date was September 10, which was before Vicki had left Santa Fe on her trip.  3R.140.  On the memo line was written "BTC."  3R.140.  The date, the payee, and the memo were in Candelaria's handwriting, as was the endorsement signature on the back of the check.  3R.144.

Vicki called Meaghan about the check.  3R.144.  Meaghan said she didn't know anything about it, so she put Candelaria on the phone.  3R.144.  Candelaria told Vicki that he and John had talked about investing in Bitcoin, and that is what "BTC" was.  3R.144.  Vicki thought it was odd for several

reasons, including that John hadn't talked to her about it, but she decided she would figure it out later after John had recovered. 3R.147, 167.

Vicki didn't talk to John about the check until John was in rehab and the police were asking her questions about the crime scene and the drawer where their checks were kept. 3R.150-51. When Vicki mentioned this to John, he said, "Oh, my God. Vicki, I wrote a check in the closet." 3R.151. Vicki told John that the only big check he had written recently "was the $23,000 check to Marc." 3R.151. John asked, "What check to Marc?" 3R.151. After a moment, John told Vicki, "You need to call the police right now." 3R.151.

Candelaria didn't go to work on September 14, 2021. 3R.245. He did, however, deposit the $23,000 check into his bank account at 8:58 a.m. that morning in Espanola, New Mexico. 3R.257, 261. Prior to the deposit, he had $8.47 in his account. 3R.268.

At 10:21 a.m. that morning, while his father-in-law laid in a pool of his own blood, Candelaria started gambling at the Buffalo Thunder casino in Pojoaque, New Mexico. 3R.294, 315. Candelaria was a frequent gambler at Buffalo Thunder. 3R.302-05. Between September 3, 2020, and May 10, 2022, he gambled $241,231 at the casino, losing $85,596.26. 3R.301, 313.

**B.  Candelaria robs a Bank of America branch and gets away with $24,000.**

Six weeks later, on October 31, 2021, a man later identified as Candelaria entered the Bank of America branch in downtown Santa Fe and stood in line at the teller window.  3R.427-28; 2R.43.  He wore a gaiter mask that covered his face and carried a clipboard.  3R.428.  When the teller, Steven Mullen, called him up, Candelaria asked if the manager was available to sign for an industrial dumpster that was in the parking lot.  3R.428.  Mullen called to the manager, Puneet Syal, who began talking to Candelaria at the next window.  3R.428.

Candelaria handed Syal the clipboard, which contained a type-written demand note consisting of four or five paragraphs.  3R.429, 437.  The note said that the perpetrator was with the cartel and it contained an instruction not to give him any fake bills or dye packs.  3R.429, 437.  It also contained a threat:  "If you don't comply, imagine you and your family's name on tombstones."  3R.429, 437-38.

Syal didn't have any cash, so he handed the clipboard to Mullen.  3R.429, 438.  Mullen gave Candelaria around $24,000 in cash.  3R.433, 438.  Mullen pressed his security fob after Candelaria left to notify the police of the robbery.  3R.433.  Police were unable to locate the perpetrator, but a witness

said they saw him run from the bank towards a white vehicle parked on the side of the road and drive away.  2R.44.

### C.    A bank robbery demand note is found in Candelaria's vehicle by SFPD and subsequently seized by FBI during a consent search.

On November 22, 2021, a detective with the Santa Fe Police Department working the check fraud investigation obtained a search warrant for a white Volkswagen Jetta that was registered to Meaghan Hennelly but primarily used by Candelaria.  1R.38; 3R.60-62.  SFPD seized the vehicle from Candelaria the next day and searched it pursuant to the warrant on November 29, 2021.  2R.44.  They found this hand-written note in the vehicle:



3R.49 (Exhibit 12).

Recognizing the similarities between this note and the wording of the note that was used in the October 31 bank robbery, SFPD contacted the FBI agent assigned to that robbery, Special Agent Samuel Hartman. 3R.37. They invited Agent Hartman to an interview they had scheduled with Meaghan at their office the next day. 3R.39. At that interview, on November 30, 2021, Meaghan consented to a search of the vehicle, and Agent Hartman seized the note from the vehicle's front passenger seat visor. 3R.43, 48.

**D.    Candelaria is charged in federal court with bank robbery and moves to suppress the demand note seized from the Jetta.**

On May 10, 2022, a federal grand jury in the District of New Mexico returned an indictment charging Candelaria with a single count of bank robbery, in violation of 18 U.S.C. § 2113(a). 1R.21.

On October 2, 2023, Candelaria filed a motion to suppress the note seized from the Jetta by Agent Hartman. 1R.22-26. He argued that Meaghan lacked actual authority to grant consent to search the vehicle. 1R.24-26. The United States opposed the motion, arguing that Meaghan had actual and apparent authority to consent to the search. 1R.30-33. It further argued that the note would inevitably have been discovered through a valid search warrant if Meaghan had denied consent, and that, in any event, suppression was not appropriate based on the good faith exception. 1R.33-36.

The court held a hearing on December 18, 2023. 3R.27-28. Agent Hartman testified that he sought consent to search from Meaghan because she was the sole owner of the vehicle and SFPD had informed him that Meaghan was the only person who would be allowed to retrieve it from the SFPD impound lot. 3R.47. He testified that he had no reason to believe that Meaghan did not have authority to consent to the search. 3R.46. He further testified that if Meaghan had denied consent, he would have obtained a search warrant based on probable cause to believe the bank robbery demand note was in the vehicle. 3R.47-48.

Meaghan testified that when she and Candelaria first moved to Santa Fe in 2019, they shared a vehicle. 3R.58-59. Candelaria used it to drive to and from work in Los Alamos, and M.H. used it on the weekend to run errands. 3R.59. The next year, Meaghan and Candelaria decided to purchase another vehicle as "a second family car." 3R.59-60, 76. Candelaria found the Jetta online and they went together to test drive it "to make sure it would accommodate [their] needs for a second car." 3R.60. In September 2020, Meaghan purchased the Jetta; it was registered in her name and she was the primary insurance policyholder. 3R.60-61. Meaghan obtained a loan to purchase the Jetta, and she made the $300 loan payment every month. 3R.61. Candelaria contributed $2000 to $2500 to the household every month, which helped pay for both vehicles, insurance, and food. 3R.61. Candelaria

was the primary driver of the Jetta. 3R.62. But while Meaghan only drove the Jetta "a few times," there was no restriction on her access to it or her ability to search it if she desired. 3R.62. There were spare keys to both vehicles in a drawer in their home. 3R.68.

While the Jetta was in the SFPD impound lot, Meaghan continued to make the $300 monthly loan payments. 3R.68. She and Candelaria were no longer living together. 3R.72. Candelaria did not reimburse Meaghan for those loan payments, 3R.68, nor did he contact her to try to retrieve the Jetta, 3R.72. After paying $227.72 to the city of Santa Fe to release the Jetta from the impound lot, Meaghan paid off the loan and sold the Jetta. 3R.72-74.

The district court denied Candelaria's motion to suppress. 1R.252-64. The court found that Meaghan had actual authority to consent to a search of the Jetta based on two independent theories. First, the court found that both Meaghan and Candelaria "had mutual use of the property by virtue of joint access." 1R.257. Second, the court found that Meaghan "had control over the vehicle for most purposes[.]" 1R.258. Alternatively, the court found that Meaghan had apparent authority to consent to a search of the Jetta because Agent Hartman had a reasonable belief "that [Meaghan] had mutual use of the vehicle by virtue of joint access and/or control over it for most purposes." 1R.258-59.

The court further found that even if Meaghan did not validly consent to the search, the note would inevitably have been discovered through a lawful search warrant. 1R.261-63. Finally, the court agreed with the government that the good faith exception to the exclusionary rule applied because Agent Hartman's actions were objectively reasonable and he relied on Meaghan's consent in good faith. 2R.263-64.

### E. Candelaria is convicted of bank fraud at trial, pleads guilty to bank robbery, and is sentenced to 26 years' imprisonment.

The federal grand jury returned a superseding indictment adding a count charging bank fraud, in violation of 18 U.S.C. § 1344(2), relating to the $23,000 check executed by John Hennelly. 2R.39. The counts were severed for trial, 2R.39, and Candelaria went to trial on the bank fraud count, 3R.99. The jury found Candelaria guilty. 3R.386. Candelaria then pled guilty to the bank robbery count pursuant to a conditional plea agreement, by which he retained the right to appeal the denial of his motion to suppress, as well as any sentence above the guideline range. 1R.414-24.

A presentence report (PSR) was prepared. The PSR concluded that Candelaria's total offense level for both counts was 23, 2R.49, and his criminal history category was I, 2R.51. The corresponding guideline imprisonment range was 46 to 57 months. 2R.58. The PSR concluded that

"an upward variance outside the advisory guideline range may be warranted in this case." 2R.63.

The United States filed a sentencing memorandum requesting that the court vary upward and impose a sentence of 30 years' imprisonment. 1R.877-98.[3] Candelaria filed a sentencing memorandum in which he requested a guideline sentence of "no more than" 46 months' imprisonment. 1R.935-41.[4]

Candelaria appeared before the district court for sentencing on July 17, 2024. 3R.399. The United States called four witnesses.

John Hennelly and his brother Michael, a medical doctor, testified to the extent and lasting impact of J.H.'s injuries. 3R.404-26. Specifically, Michael testified to the "multiple ways" the injuries had affected John:

> His hearing deteriorated. His sense of smell, which is the main component of taste, was damaged. His ability to swallow was impaired. His ability to enunciate or speech – or speak, a combination of the muscles together with the nerves to those muscles was altered. His ability to be coordinated in his ambulation or walking. His ability to respond. Prior to that, he was driving and functional and doing all kinds of chores and activities around the house, but subsequent to it, he doesn't have the ability to respond quickly enough so that it would be safe for him to drive.

---

[3] The United States attached multiple exhibits, including photographs of a badly-injured J.H. at the hospital, to its memorandum. 1R.899-934.

[4] Candelaria also filed objections to the PSR, 1R.425-29, which the district court overruled at the sentencing hearing, 3R.448, 451, 454, and which are not relevant to this appeal.

3R.410.

The two Bank of America employees, Mullen and Syal, testified to the general facts of the bank robbery and to the death threat contained within the demand note. 3R.427-41.[5] Mullen testified that he "started panicking" and "was very distraught" because of the note, and he became emotional while testifying about it. 3R.431.

After hearing from counsel and Candelaria personally, the court stated that it had "spent an extraordinary amount of time in this case, not just sitting through trial, but sitting through the hearings, sitting through today's hearings, and considering all of the information" that was before the court. 3R.486. The court noted that Candelaria cashed the $23,000 check and gambled while J.H. was lying in the closet on the brink of death. 3R.487. That "coldly and calculatingly executed" crime, as the court described it, was "clearly [] premeditated," and it left a formerly "very active" older man to "live with the permanent and visible effects of that trauma, along with the emotional trauma, for the rest of his life." 3R.488-89. The court expressed its belief that the name of the crime—"bank fraud"—did not accurately convey the facts of the case, which were "vile," "egregious," and "truly horrif[ying]," 3R.487, bringing the case "far outside the heartland" of the bank fraud

---

[5] That typewritten note was never recovered. *See* 3R.446.

12

guideline, 3R.496. The court also commented on Candelaria's betrayal of his wife's family, who had taken him in and provided him with financial support. 3R.488.

Turning to the sentencing factors contained in 18 U.S.C. § 3553(a), the court first addressed Candelaria's history and characteristics. 3R.490. The court acknowledged that Candelaria had a traumatic childhood and that his mother died in 2021, which he claimed caused him to go "into a deep alcohol issue[.]" 3R.490-91. But the court also looked at Candelaria's criminal history, which included a 2005 robbery conviction that "cause[d] the Court great concern about [Candelaria's] mindset and about whether or not [he] will commit another crime." 3R.491. In that case, Candelaria was working at a McDonald's and "conspired with another person to rob [his] manager of a bank drop," using his "insider knowledge to tip-off [his] co-defendant when the manager had the bank drop and was leaving with [it]." 3R.491. The charges of conviction and Candelaria's history convinced the court that Candelaria would "continue to take what [he] want[s], when [he] want[s] it, regardless of the cost financially or physically to others." 3R.492.

The court also concluded that Candelaria has "no respect for the law." 3R.494. This conclusion was bolstered by Candelaria's conduct on pretrial release, when he "committed a DWI" and "lied to [his] pretrial services officer about the extent of it[.]" 3R.494. The court noted that Candelaria's lack of

remorse or accountability, which was "greatly concerning to the Court," seemed to indicate that he justified his behavior in his mind. 3R.495. The court was troubled by "[t]he level of manipulation, deceit, self-absorption and self-gratification that [Candelaria has] exhibited over a number of years, along with" his "escalat[ing]" "willingness to exploit the vulnerable and take advantage of trust and opportunities available to [him] over [his] life." 3R.496-97. And the court "agreed with the United States that [Candelaria's] criminal history substantially understates the crimes herein and what [Candelaria is] capable of[.]" 3R.497.

The court concluded that "a sentence well above the guideline range is necessary in this extraordinary circumstance" in order accomplish the sentencing goals of § 3553(a)(2). 3R.496. The court sentenced Candelaria to 240 months' imprisonment on count 1 and 72 months' imprisonment on count 2, to be served consecutively, for a total sentence of 26 years' imprisonment. 3R.500.

The judgment reflecting that sentence was entered that same day. 1R.953-60. On July 30, 2024, Candelaria filed a timely notice of appeal. 1R.961

## SUMMARY OF THE ARGUMENT

The district court correctly denied Candelaria's motion to suppress for multiple reasons. First, Meghan Hennelly had actual authority to consent to

a search of the Jetta.  Actual authority can be based on either mutual use of the property by virtue of joint access or control over the property for most purposes.  Here, Meaghan had both.  She had mutual use of the Jetta by virtue of joint access because she purchased and was the registered owner of the Jetta, she had access to a spare key, she drove it several times, and she testified that she felt free to search it or use it as she desired.  And the fact that Meaghan and Candelaria were married gave rise to a presumption of control over the Jetta for most purposes, a presumption that Candelaria did not rebut.

Second, even if Meaghan did not have actual authority, she had apparent authority.  Before asking for Meaghan's consent, Agent Hartman knew that Meaghan—Candelaria's wife—was the registered owner of the Jetta and that she was the only person to whom SFPD would release it from impoundment.  Based on the facts known to him, it was reasonable for Agent Hartman to believe that Meaghan had authority to consent to a search of the Jetta.

Third, even if Meaghan had neither actual nor apparent authority, the evidence would inevitably have been discovered through a lawful search warrant.  Even before Meaghan consented to a search of the Jetta, Agent Hartman had probable cause to believe evidence of the Bank of America robbery was inside the vehicle.  And, as Agent Hartman specifically testified,

if Meaghan had not consented, he would have sought a search warrant based on that probable cause.

Finally, the warrantless search of the Jetta was lawful under both the automobile exception and the foregone-conclusion doctrine. While the government did not raise these arguments before the district court, because the record is adequately developed, this Court can affirm on either alternative ground.

As for Candelaria's 26-year sentence, it was both procedurally and substantively reasonable. Candelaria's procedural reasonableness argument—that the district court failed to specifically discuss how its sentence avoided unwarranted sentencing disparities—is reviewed only for plain error. Candelaria fails to meet his burden under this standard. To start, Candelaria does not show that the district court even erred, much less plainly so. There is no requirement, either statutory or under Tenth Circuit precedent, that a sentencing court discuss each § 3553(a) factor. But even if the district court did commit error that is plain, Candelaria has not shown that the error affected his substantial rights. The record clearly establishes that the district court considered this case to be far more egregious than the run-of-the-mill bank fraud case, and thus any sentencing disparity was warranted. Accordingly, it is highly unlikely that the court would have imposed a lesser sentence if it had specifically discussed that § 3553(a) factor.

With regard to Candelaria's substantive reasonableness argument, the district court did not abuse its discretion in sentencing Candelaria to 26 years' imprisonment for his bank fraud and bank robbery convictions. The court stated that it had considered all of the § 3553(a) factors, and it discussed multiple factors at length. In doing so, the court more than adequately explained why it believed a substantial upward variance was necessary to achieve the goals of sentencing. The district court's sentence was well within the bounds of permissible choice, and this Court should affirm.

## ARGUMENT

### I. The district court correctly denied Candelaria's motion to suppress.

#### A. Standard of review

"When reviewing the denial of a motion to suppress, [this Court] view[s] the evidence in the light most favorable to the government, accept[s] the district court's findings of fact unless they are clearly erroneous, and review[s] de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020) (citation and internal quotation marks omitted).

#### B. The search of the Jetta was based on valid consent.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Const. amend. IV. For a search or seizure to be reasonable, it must ordinarily be supported by a warrant based on probable cause. *See United States v. Ventresca*, 380 U.S. 102, 106–07 (1965) (noting that the "limited" warrant exceptions "underscore[ ] the preference accorded police action taken under a warrant as against searches and seizures without one" (footnote omitted)). One exception to the warrant requirement is a search that is conducted with voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012).

A person other than the defendant can grant valid consent to search, so long as that third party has "actual or apparent authority to do so." *United States v. Sanchez*, 608 F.3d 685, 689 (10th Cir. 2010) (quotation marks and citation omitted); *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1230 (10th Cir. 1998) ("The consent of a third party to a search of common premises is effectual if the third party has either the actual authority or the apparent authority to consent to a search.").[6] Here, the district court correctly concluded that Meaghan Hennelly had actual authority, and at least apparent authority, to consent to a search of the Jetta.

---

[6] Moreover, "any consent granted by a third party must be voluntary." *Gutierrez-Hermosillo*, 142 F.3d at 1230. Here, the district court found that Meaghan Hennelly's consent was voluntary, 1R.260, and Candelaria does not challenge that finding.

1. *Meaghan Hennelly had actual authority to consent to a search of the Jetta.*

"One has authority to consent if she 'possess[es] common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Bass*, 661 F.3d 1299, 1305 (10th Cir. 2011) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974) (brackets in *Bass*). "Common authority … rests … on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the [joint users] has the right to permit inspection in his own right and that the others have assumed the risk that one of their number might" consent to a search of the property. *Id.* (quoting *Matlock*, 415 U.S. at 171 n.7) (ellipses in *Bass*); *United States v. Rith*, 164 F.3d 1323, 1328 (10th Cir. 1999).

"[A] third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Rith*, 164 F.3d at 1329. Here, as the district court correctly concluded, Meaghan Hennelly had actual authority under both prongs, either of which is sufficient to establish the legitimacy of the search. *See id.* (noting that this "test is disjunctive").

a.    Meaghan Hennelly had mutual use of the Jetta by virtue of her joint access to it.

"Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search." *Rith*, 164 F.3d at 1329-30. Here, the district court found that Meaghan "had unrestricted, joint access to [the Jetta] when needed." 1R.257. Further, as the court noted, the evidence established that Meaghan "purchased the vehicle, was the registered owner and insurance policyholder, made the vehicle's monthly loan payments, drove it several times, had access to a spare key, had joint property in the vehicle (a child's car seat), was the sole person who could retrieve the vehicle after its impoundment, and subsequently sold it." *Id.* Moreover, Meaghan specifically testified that she felt free to search or use the Jetta as she desired. 3R.62. These facts establish that Meaghan had joint access to the Jetta, and that she therefore had actual authority to consent to a search of it.[7]

Candelaria argues that the arrangement between Candelaria and Meaghan was for Candelaria to use the Jetta and Meaghan to use the Volvo. Op. Br. 18. But the fact that Meaghan did not regularly use the Jetta does

_____

[7] Candelaria's reliance on Meaghan's testimony that he used the Jetta "exclusively" is misplaced. Def. Br. 19. That testimony pertained to whether Candelaria used the Volvo, not whether Meaghan ever used the Jetta. 3R.76.

not mean she did not have free access to it.  Candelaria makes much of Meaghan's testimony "that she first had to coordinate with Candelaria to use the car."  *Id.*  But that is true with almost any shared property; the fact that Meaghan had to *coordinate* with Candelaria does not mean that she had to obtain Candelaria's *permission* to use the Jetta.  Indeed, Candelaria's argument simply ignores Meaghan's testimony that she felt free to search or use the Jetta as she desired.  3R.62.  Candelaria's assertion that Meaghan's "connection to the Jetta was on paper only," Op. Br. 20, is flatly contrary to the record.  *See, e.g.,* 3R.59-60, 76 (Meaghan's testimony that the Jetta was purchased as "a second *family* car").  The district court correctly found that Meaghan had unrestricted, joint access to the Jetta when needed.  Because Meaghan had mutual use of the Jetta by virtue of joint access, she had actual authority to consent to the vehicle search.

> b. Meaghan Hennelly had control of the Jetta for most purposes.

As this Court explained in *Rith*, "[u]nlike the fact-intensive inquiry for mutual use, control for most purposes of property is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."  164 F.3d at 1330.  "If a relationship creates such a presumption of control and is unrebutted, the

third party has authority to consent to a search of the property." *Id.* One

type of relationship that gives rise to the presumption of control is that of

husband and wife. *Id.* "[T]he presumption may be rebutted by facts showing

an understanding or agreement between the defendant and the third party

that the latter must have *permission*" to access the property at issue. *Id.*

(emphasis added).

Here, the district court correctly found that Candelaria had not

rebutted the marital presumption, as he presented no evidence establishing

an understanding or an agreement between him and Meaghan that the Jetta

was off-limits to Meaghan. Indeed, the evidence established the contrary,

that Meaghan could access the Jetta whenever she liked. In fact, at the

moment she gave consent, Meaghan was the *only* person the impound lot

would release the vehicle to. Accordingly, Meaghan had actual authority to

consent to a search of the Jetta based on control of it for most purposes.

> 2. *Meaghan Hennelly had apparent authority to consent to a search of the Jetta.*

"Even when actual authority is lacking, a third party has apparent

authority to consent to a search if a police officer reasonably, but erroneously,

believes that the third party has actual authority to consent." *United States*

*v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007). In other words, apparent

authority exists if "the facts available to the officer at the moment warrant a

man of reasonable caution to believe that the consenting party had authority over the premises." *United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004) (quotation marks and citation omitted; cleaned up). "[W]here an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." *Id.*

Here, it was reasonable for Agent Hartman to believe Meaghan had authority over the Jetta such that she could consent to a search it. Prior to seeking consent from Meaghan, Agent Hartman knew that she was the registered owner of the Jetta and that she was the only person to whom SFPD would release the Jetta from impoundment. While Meaghan told Agent Hartman that she had purchased the Jetta for Candelaria "to drive back and forth to work," 3R.46, that fact alone—especially given the marital presumption—did not create ambiguity requiring further inquiry.[8] And regardless, further inquiry would have only confirmed that Meaghan in fact believed she had actual authority over the Jetta.

---

[8] Candelaria asserts that Agent Hartman "knew the couple considered the car to be Candelaria's alone," Op. Br. 24, but he does not cite to anywhere in the record for that assertion and there was no evidence presented to that effect. Agent Hartman knew that Candelaria was driving the Jetta when it was seized by SFPD, 3R.51, and he testified that he couldn't remember if Meaghan told him whether or not she used the Jetta, 3R.46. But that would not lead a reasonable officer to believe that Candelaria had sole control over the Jetta, to the exclusion of his wife—who was also the registered owner.

Candelaria's reliance, Op. Br. 24-25, on this Court's decision in *United States v. Salinas-Cano*, 959 F.2d 861 (10th Cir. 1992), is misplaced. In *Salinas-Cano*, the defendant "left his suitcase at his girlfriend's apartment, where he spent several nights each week at her invitation." 959 F.2d at 862. After arresting Salinas-Cano at another location, officers went to the apartment and obtained the girlfriend's consent to search it. *Id.* She showed officers where the defendant kept his belongings, including the suitcase. *Id.* Officers searched the suitcase and found a quantity of cocaine inside. *Id.*

The district court denied the defendant's motion to suppress. *Id.* at 863. On appeal, Salinas-Cano conceded that the girlfriend "could consent to the search of the premises, but he constest[ed] her authority over his closed suitcase." *Id.* This Court reversed, holding that the girlfriend had neither actual nor apparent authority to consent to a search of the suitcase. *Id.* at 865. With regard to actual authority, the Court held that "ownership and control of property does not automatically confer authority over containers within it" and there was no evidence that the girlfriend "exercised mutual use or possessed the joint interest and control over the suitcase necessary to legitimize her consent to search it." *Id.* at 865. With regard to apparent authority, the Court held that "[t]he information known to the officer was insufficient to support a reasonable belief" in the girlfriend's authority. *Id.* at 866.

Unlike the girlfriend in *Salinas-Cano*, Meaghan was the owner of the actual property to be searched. In addition, Candelaria and Meaghan were married, thus giving rise to a presumption under the law that Meaghan had access to the Jetta. Even if Agent Hartman was unaware of a fact that would rebut that presumption, that does not make Agent Hartman's belief in Meaghan's authority unreasonable. Moreover, Candelaria ignores Agent Hartman's testimony that he knew at the time he requested consent from Meaghan that SFPD would only release the Jetta to Meaghan, "and that she didn't have to give the vehicle back to Mr. Candelaria[.]" 3R.47.[9] While the United States did not contest Candelaria's standing below and does not challenge it now, this fact helps demonstrate the reasonableness of Agent Hartman's belief that Meaghan had authority to consent to a search. *See United States v. Banks*, 262 Fed. Appx. 900, 905 (10th Cir. 2008) ("Where an occupant of a hotel room is evicted, he or she no longer has a right to privacy in the room, and there can be no invasion thereof.").

Because Meaghan had apparent authority to consent to a search of the Jetta, this Court can also affirm the denial of Candelaria's motion to suppress on that ground.

---

[9] Indeed, when asked why she didn't give the Jetta to Candelaria after she retrieved it from impoundment, Meaghan testified: "Because I had made all the payments on it. I was responsible for it. I would – there was no reason for me to offer him the vehicle." 3R.73.

## C. Inevitable discovery

Even if this Court concludes that Meaghan did not have actual or apparent authority to consent to the search of the Jetta, it should hold that the inevitable discovery exception applies. Under this exception, evidence obtained in violation of the Fourth Amendment "need not be suppressed if agents inevitably would have discovered it through lawful means independent from the unconstitutional search." *United States v. Loera*, 923 F.3d 907, 928 (10th Cir. 2019); *Nix v. Williams*, 467 U.S. 431, 448 (1984) ("[When] the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible.").

"In cases like this one, where the theory of inevitable discovery is that a warrant would have been obtained but for the illegal search, the district court must determine 'how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant.'" *United States v. Christy*, 739 F.3d 534, 541 (10th Cir. 2014) (quoting *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000)). Four factors aid in this determination:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law

> enforcement agents 'jumped the gun' because they lacked
> confidence in their showing of probable cause and wanted to
> force the issue by creating a fait accompli.

*Id.* (quoting *Souza*, 223 F.3d at 1204). Factors 1 and 3 are particularly

important. *Id.*

The government bears the burden of proving by a preponderance of the

evidence that it would inevitably have discovered the evidence through

"lawful means." *Loera*, 923 F.3d at 928. The United States satisfied that

burden here.

Contrary to Candelaria's contention, Op. Br. 28-32, the "lawful means"

need not be a "second, independent *investigation*." *Loera*, 923 F.3d at 928.

"Rather, the inevitable discovery doctrine will apply if there was 'one line of

investigation that would have led inevitably to the obtaining of a search

warrant by independent lawful means but was halted prematurely by a

search subsequently contended to be illegal.'" *Id.* (quoting *Christy*, 739 F.3d

at 540). "The key to applying this doctrine is to place the government officers

in the 'same positions they would have been in had the impermissible conduct

not taken place,' and, from that vantage point, to ask whether the

government would have inevitably discovered the evidence lawfully." *Id.*

(quoting *Nix v. Williams*, 467 U.S. at 447).

Looking at the first and third factors, Candelaria asserts that the fact

that Agent Hartman had not started the process of applying for a search

warrant before seeking Meaghan's consent "tilts against the government and the application of the exception." Op. Br. 36; *see also id.* at 30 ("The exception has been correctly applied where an illegal search was conducted but officers were already in the process of obtaining a valid warrant based on probable cause when the illegality occurred."). This Court has clearly held, however, that "evidence of steps to obtain a warrant is one way the government might meet its burden of showing that a warrant would have ultimately been obtained, *but not the only way.*" *Christy*, 739 F.3d at 543 (emphasis added). Here, Agent Hartman testified unequivocally that he would have sought a warrant if Meaghan had denied consent. 3R.48.

Candelaria further questions why Agent Hartman never sought a lawful warrant, asserting that his "choices remain unexplained but do not favor the exception's application." Op. Br. 37; *see also id.* at 35 ("Nowhere in the record has [Agent Hartman] offered a reason why he did not [seek a warrant]."). This assertion is curious, as the explanation for Agent Hartman's choices are readily apparent from the record. SFPD had already arranged for an interview with Meaghan, who Agent Hartman knew to be Candelaria's wife, the registered owner of the Jetta, and the only person to whom SFPD would release the vehicle. Agent Hartman believed Meaghan had authority to consent, and her voluntary consent would make a search warrant unnecessary. And he knew that the evidence he was looking for was

in the Jetta—SFPD detectives had already seen it and described it to him. Once Meaghan consented to the search and Agent Hartman retrieved the demand note from the Jetta, there was simply no need to obtain a search warrant.

The fact that Agent Hartman never sought or obtained a search warrant does not preclude application of the inevitable discovery doctrine. In *Christy*, 739 F.3d at 541, for instance, this Court applied inevitable discovery even though the officers had taken no steps to obtain a warrant before the warrantless search. In *Christy*, inevitability was established by strong probable cause and the likelihood that a warrant would have issued. *Id*. Consistent with this conclusion, the Seventh Circuit has explained that the test is not whether "the investigators in fact obtained or sought a warrant" but rather whether "it would be unreasonable to conclude that, after discovering all of the information, the officers would have failed to seek a warrant." *United States v. Pelletier*, 700 F.3d 1109, 1117 (7th Cir. 2012) (quotation marks and citation omitted). Here, it is unreasonable to think that Agent Hartman would have failed to seek a warrant if Meaghan had refused consent to search the Jetta, when he knew that a demand note similar to the one used in the bank robbery he was investigating was in the Jetta.

As for the second factor, Agent Hartman testified that the probable cause for the warrant was the bank robbery demand note that SFPD had described to him. 3R.48.[10] Candelaria asserts that Agent Hartman "had not placed the car at the bank, did not know who wrote the note or who knew it was there, or how it got in the car." Op. Br. 36. But those questions do not negate probable cause to believe that a demand note with similar language to the one used in the Bank of America robbery would constitute evidence of that crime. To the contrary, there was sufficient probable cause for a magistrate judge to have issued a warrant if one were sought.

Finally, as for the fourth factor, there is simply no indication that Agent Hartman jumped the gun because he lacked confidence in the existence of probable cause. The reason Agent Hartman did not get a warrant is that he believed he had valid consent to search the Jetta, not that he did not have probable cause.

In the end, "[t]he ultimate question when applying inevitable discovery to factual situations like the one here is 'how likely it is that a warrant would have issued' and the evidence found." *Christy*, 739 F.3d at 543 (quoting *Souza*, 223 F.3d at 1204). Here, it is highly likely that a warrant would have

---

[10] Although Agent Hartman didn't articulate it at the suppression hearing, law enforcement also knew that a witness had observed the bank robbery suspect drive away in a white vehicle, and the Jetta was a white vehicle. 2R.44.

issued based on the probable cause to believe that a demand note similar to the one used in the Bank of America robbery was in the Jetta. And it is similarly highly likely that the evidence would have been found, given that the Jetta was impounded. *See Souza*, 223 F.3d at 1206 (concluding "there is no question" the evidence would have been found "because the package [containing the evidence] was secured by the officers"). Therefore, this Court should affirm the district court's finding that the inevitable discovery doctrine applies here.

**D.    In the alternative this Court may affirm on either the vehicle exception or foregone-conclusion doctrine.**

Finally, even if the Court rejects the grounds upon which the district court relied in denying Candelaria's motion to suppress, it should affirm the district court on either of two other bases: the vehicle exception to the warrant requirement or the "foregone-conclusion doctrine." Even though the United States did not raise these arguments below, the record supports both grounds for affirmance, and this Court "can affirm on alternative grounds when the district court record is adequately developed." *United States v. Bagley*, 877 F.3d 1151, 1154 (10th Cir. 2017).

1.    *Automobile exception*

Under the "automobile exception" to the warrant requirement, "when police officers have probable cause to believe there is contraband inside an

automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261 (1982); *accord Florida v. Meyers*, 466 U.S. 380 (1984) (upholding warrantless search of an impounded car that had already been subject to a legitimate search); *United States v. Johns*, 469 U.S. 478, 484 (1985) ("A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search."). Here, Candelaria never disputed that the Jetta was lawfully in police custody and, as discussed above, the record establishes there was probable cause to believe it contained evidence of the Bank of America robbery. Therefore, Agent Hartman was authorized to conduct a warrantless search of the Jetta pursuant to the automobile exception.

2.  *"Foregone-conclusion doctrine"*

Agent Hartman's warrantless search of the Jetta is further justified by the "foregone-conclusion exception" to the warrant requirement. In *United States v. Corral*, this Court held:

> [W]here the police have already seen the contents of a seized container prior to conducting the search, there is no significant additional invasion of privacy involved in searching the container. Searches compromise the individual interest in privacy, and the prohibition against unreasonable searches serves primarily as a protection against unjustified intrusions on privacy. However, where the police already possess

> knowledge approaching certainty as to the contents of the
> container, the search of the container does not unreasonably
> infringe upon the individual interest in preserving the privacy
> of those contents.

970 F.2d, 719, 725–26 (10th Cir. 1992). That reasoning applies with full force

here. The Santa Fe police had already lawfully seen the demand note inside

the Jetta prior to Agent Hartman's search and, thus, Agent Hartman

possessed "knowledge approaching certainty" that the demand note was in

the Jetta. Agent Hartman's search of the Jetta simply to retrieve the note

did not unreasonably infringe on Candelaria's privacy interest in the contents

of the Jetta.

## II. Candelaria's sentence is procedurally and substantively reasonable.

### A. Standard of review

This Court "review[s] 'all sentences—whether inside, just outside, or

significantly outside the Guidelines range—under a deferential abuse-of-

discretion standard.'" *United States v. Gross*, 44 F.4th 1298, 1301 (10th Cir.

2022) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). The deference

due the sentencing court reflects not only its unique role as a factfinder, but

also its "institutional experience of imposing large numbers of sentences, the

vast majority of which are never appealed." *United States v. Smart*, 518 F.3d

800, 807 (10th Cir. 2008).

The Court's "reasonableness review has two aspects: procedural and substantive." *United States v. Cookson*, 922 F.3d 1079, 1091 (10th Cir. 2019). Procedural reasonableness "consider[s] whether the district court committed any error in calculating or explaining the sentence." *Id.* (internal quotation marks omitted). Such errors might include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51.

In reviewing the substantive reasonableness of a sentence, the Court "focus[es] on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Cookson*, 922 F.3d at 1091 (internal quotation marks omitted). The Court will "deem a sentence unreasonable only if it is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Gantt*, 679 F.3d 1240, 1249 (10th Cir. 2012)).

## B. Candelaria's 26-year sentence is procedurally reasonable.

Candelaria argues that the district court committed procedural error by not discussing, "as required by § 3553(a)(6), whether its 21 year upward variance avoided unwarranted sentencing disparities among similarly

situated defendants found guilty of similar conduct." Op. Br. 39. He acknowledges that he did not raise this objection at sentencing, and that the argument is therefore reviewed only for plain error. *Id.* Under that standard, this Court "will only vacate the sentence if: (1) there is error; (2) that is plain; (3) that affects substantial rights, or in other words, affects the outcome of the proceeding; and (4) substantially affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Chavez*, 723 F.3d 1226, 1232 (10th Cir. 2013).

Candelaria's argument stumbles out of the gate, as he fails to establish that the district court erred, much less plainly so.[11] Candelaria asserts that "§ 3553(a)(6) expects an analysis of sentencing disparities created by the court's sentence to be part of its sentencing deliberations." Op. Br. 40. On its face, however, § 3553(a)(6) contains no such analysis requirement. It simply provides that the sentencing court, "in determining the particular sentence to be imposed, shall *consider* … the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6) (emphasis added).

---

[11] "An error is plain when it is 'clear or obvious' that it is contrary to current Supreme Court or Tenth Circuit law." *United States v. Hicks*, 116 F.4th 1109, 1114 (10th Cir. 2024) (citing *United States v. Koch*, 978 F.3d 719, 726 (10th Cir. 2020)).

Nor does Candelaria cite any case establishing this supposed requirement of an on-the-record § 3553(a)(6) sentencing disparity analysis. To the contrary, this Court has held that a sentencing court is *not* required to specifically address every § 3553(a) factor. *United States v. Pinson*, 542 F.3d 822, 833–35 (10th Cir.2008) (holding that even when the sentencing court varies from the guidelines, it need not explicitly discuss each of the § 3553(a) factors; only when a party raises a material, nonfrivolous argument regarding a factor does procedural reasonableness require a response from the court); *United States v. Martinez*, 455 F.3d 1127, 1132 (10th Cir. 2006) ("[T]he sentencing court does not abuse its discretion by failing to mention each of the § 3553(a) factors."). While the district court must *consider* each § 3553(a) factor, explicit *discussion* of every factor is not required. *Pinson*, 542 F.3d at 833–35; *Gantt*, 679 F.3d at 1249.[12] For example, in *United States v. Jenkins*, 2024 WL 4601486 (10th Cir. 2024) (unpublished), the district court imposed an upwardly variant sentence of 72 months' imprisonment,

---

[12] Specifically with regard to § 3553(a)(6), this Court said in *Gantt*, "one can say as a general rule that when a court considers what the guideline sentence (or sentencing range) is, it necessarily considers whether there is a disparity between the defendant's sentence and the sentences imposed on others for the same offense." 679 F.3d at 1248–49. *See also Gall*, 552 U.S. at 54 ("Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."). Here, the district court correctly calculated and considered the applicable guideline range.

from a guideline imprisonment range of 30 to 37 months. 2024 WL 4601486, at *1. On appeal, Jenkins "criticize[d] the court for not discussing factors other than his criminal history, substance use, and dangerousness." *Id.* at *3. This Court dismissed that criticism because, it said, a sentencing court is "not required to address every § 3553(a) factor." *Id.*

Here, the district court explicitly stated that it had considered "the factors set forth in 18 U.S.C. [§] 3553(a)(1)-(7)." 3R.498. Thus, the court did not plainly fail to consider any factor. Candelaria did not raise any sentencing disparity argument at sentencing that would have triggered an obligation for the district court to expressly address that factor. *See United States v. Lente*, 647 F.3d 1021, 1035 (10th Cir. 2011) (concluding district court committed procedural error by failing to address defendant's "material non-frivolous § 3553(a)(6) sentencing-disparity argument"). The fact that the court focused its detailed discussion on other specific factors, such as Candelaria's history and characteristics, protecting the public, and affording adequate deterrence, does not constitute error. This Court should conclude that the district court did not commit procedural error, plain or otherwise.

But even assuming the district court committed error that is plain, Candelaria has failed to meet his burden of showing there is a reasonable probability that, but for the district court's error, he would have received a lesser sentence. *See United States v. Miller*, 978 F.3d 746, 765 (10th Cir.

37

2020) ("In the sentencing context, we ask: Is there a reasonable probability that but for the court's error, [the defendant] would have received a lesser sentence?") (brackets in *Miller*) (quotation marks and citation omitted). It is crystal clear that the court did not consider this to be a mine-run case. 3R.478, 496. The bank fraud involved the use of extreme violence against Candelaria's elderly father-in-law, and it was followed six weeks later by a bank robbery that involved a death threat. Based on the district court's discussion of the facts of this case, it is apparent that the court did not consider Candelaria to be similarly situated to the average defendant convicted of bank fraud and bank robbery. On this record, it is highly improbable that if the court had explicitly discussed § 3553(a)(6) it would have imposed a lesser sentence. To the contrary, it is apparent the district court believed that any disparity was warranted.

## C. Candelaria's sentence is substantively reasonable.

### 1. *The district court acted well within its discretion in imposing a 26-year sentence.*

In reviewing the substantive reasonableness of a sentence, this Court applies a deferential abuse of discretion standard and will "uphold even substantial variances when the district court properly weighs the § 3553(a) factors and offers valid reasons for the chosen sentence." *Barnes*, 890 F.3d at 916. To establish an abuse of discretion, Candelaria "must show the sentence

exceeded the bounds of permissible choice, such that the sentence is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Gross*, 44 F.4th 1298, 1302 (10th Cir. 2022) (internal quotation marks omitted); *accord United States v. McCrary*, 43 F.4th 1239, 1249 (10th Cir. 2022). The Court does not reweigh the § 3553 factors "but instead ask[s] whether the sentence fell within the range of rationally available choices that facts and the law at issue can fairly support." *McCrary*, 43 F.th at 1249 (citation and internal quotation marks omitted).

If the district court varies above the guidelines, this Court "may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51. The Court uses the district court's explanation to assist it "in determining whether [the court] abused its discretion in weighing the § 3553(a) factors." *Cookson*, 922 F.3d at 1092 (internal quotation marks omitted). However, the district court need not give equal weight to each factor, and this Court defers to how it weighed the facts. *See id.* at 1094.

In sum, "[i]f the district court determines that a within-guidelines sentence will not accomplish the sentencing's goals, it may impose a substantively reasonable sentence outside the Guideline-imprisonment range so long as it offers significant explanation." *United States v. Valdez*, --- F.4th

---, 2025 WL 582593, at *1 (10th Cir., February 24, 2025). That is precisely what the district court did in this case.

Here, the district court stated that it had considered all the § 3553(a) factors. 3R.498. It considered the applicable guideline sentencing range of 46 to 57 months, as required by 18 U.S.C. § 3553(a)(4). *Id.* And in imposing a sentence of 26 years, the district court discussed the specific § 3553(a) factors that led it to conclude a significant upward variance was necessary— the nature and circumstances of the offense and Candelaria's history and characteristics;[13] the need to reflect the seriousness of both offenses of conviction, to promote respect for the law, and to provide just punishment;[14] the need to afford adequate deterrence to criminal conduct;[15] the need to protect the public from further crimes of Candelaria;[16] and the need to provide restitution to the victims of the offenses.[17] *Id.*

The court discussed at length Candelaria's egregious conduct in committing the offenses of conviction, his past criminal conduct, his conduct while on conditions of release, and his lack of remorse or accountability for

---

[13] 18 U.S.C. § 3553(a)(1).

[14] 18 U.S.C. § 3553(a)(2)(A).

[15] 18 U.S.C. § 3553(a)(2)(B).

[16] 18 U.S.C. § 3553(a)(2)(C).

[17] 18 U.S.C. § 3553(a)(7).

his actions.  3R.487-97.  The court noted that "[t]he level of manipulation, deceit, self-absorption and self-gratification [Candelaria] exhibited over a number of years, along with [his] willingness to exploit the vulnerable and take advantage of trust and opportunities available to [him] over [his] life has escalated."  3R.497.  The court also noted its "great concern" that Candelaria's untruthfulness on his LANL employment application—in which he omitted his prior felony conviction and "sp[un] it to be where [he was] such a great employee"—in conjunction with the facts of the bank fraud offense evidenced a "pattern of twisting the truth" to benefit himself and required that deterrence and protection of the public be "weigh[ed] heavily."  3R.493. It found that Candelaria's criminal history "substantially underestimates the crimes herein and what [Candelaria is] capable of[.]"  3R.497.  It further found that "[t]he facts of these two cases are unique" and, with regard to the bank fraud, "the circumstances of that case fall far outside the heartland of those considered by the United States sentencing guidelines for bank fraud." 3R.495-96.  And, based on all of that, it concluded that "a sentence well above the guideline range is necessary in this extraordinary circumstance[.]" 3R.496.

The 26-year sentence in this case "was not some random, unthoughtful, unexplained sentence."  *See Valdez*, --- F.4th at ---, 2025 WL 582593, at *3. To the contrary, the district court's explanation for the sentence it imposed

was comprehensive, detailed, and tethered to both the facts of the case and specific § 3553(a) factors. This explanation demonstrates that the court had "a reasoned basis for exercising [its] own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). The court's assessment of those § 3553(a) factors led it to reasonably conclude that a variance to 26 years was necessary to achieve the purposes of sentencing. The court's targeted and thorough discussion of multiple § 3553(a) factors offered a "compelling" justification sufficient "to support the degree of the variance." *See Gall*, 552 U.S. at 50. And its "cogent and reasonable explanation" for its sentence demonstrates that the variance was neither arbitrary nor capricious. *See United States v. Barnes*, 890 F.3d 910, 917 (10th Cir. 2018) ("A sentence is more likely to be within the bounds of reasonable choice when the court has provided a cogent and reasonable explanation for it.").

2. *Candelaria has not shown that his sentence is manifestly unreasonable.*

In challenging the substantive reasonableness of his sentence, Candelaria's procedural error argument bleeds into his substantive reasonableness argument. He asserts that the court's "procedural error produced a substantively unreasonable" sentence. Op. Br. 47. As discussed above, however, the district court did not commit procedural error. A sentencing court "need not afford equal weight" to each § 3553(a) factor, and

this Court defers to the district court's "determinations of the weight to be afforded to such findings." *Cookson*, 922 F.3d at 1094 (quotations omitted). Here, the district court stated that it had considered all of the § 3553(a) factors, and it then discussed the specific factors that it believed warranted an upward variance. That was procedurally reasonable under this Court's precedent, and it resulted in a substantively reasonable sentence.[18]

Next, Candelaria asserts that the district court's "failure to discuss § 3553(a)(6) 'creates a facially unwarranted sentencing disparity,' which, in turn, makes the sentence 'substantively unreasonable.'" Op. Br. 48 (quoting

---

[18] Here Candelaria's argument takes a sojourn into a discussion of § 3553(a)'s "parsimony principle," Op. Br. 46-47, the purpose of which is unclear. Under this principle, a sentencing court is required to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Candelaria asserts that to "properly comply" with this directive, "all listed [§ 3553(a)] factors must be addressed." Op. Br. 46. As discussed above, however, a sentencing court is not required to explicitly discuss each § 3553(a) factor. And this Court has declined to find a sentence unreasonable under the parsimony principle where "[t]he record clearly reflects that the district court was aware of its responsibilities under § 3553(a)," and thoroughly considers the defendant's particular circumstances in a way that "evinces the court's intention to tailor a sentence to him." *United States v. Martinez-Barragan*, 545 F.3d 894, 904 (10th Cir. 2008). Here, the district court specifically referenced its obligation to "fashion[] a sentence that is sufficient but not greater than necessary to support the goals of sentencing," stating, "and I do take that very seriously." 3R.487; *see also* 3R.499. The court also discussed in great detail Candelaria's particular circumstances in a way that made it clear it was tailoring a sentence specific to him and his crimes.

*United States v. Crosby*, 119 F.4th 1239 (10th Cir. 2024)).  Candelaria's heavy

reliance on *Crosby*, however, is misplaced.

In *Crosby*, the defendant was found in possession of child pornography.

119 F.4th at 1243.  When he was subsequently arrested, Crosby admitted

that he had continued to download child pornography after the initial seizure.

*Id.*  He ultimately pled guilty to two charges of possession of child

pornography.  *Id.*

Crosby's guideline imprisonment range was 78 to 97 months.  *Id.* at

1244.  The district court sentenced Crosby to "'five days or time served,

whichever is less[.]'"  *Id.* at 1245.  In granting this substantial downward

variance, the court "focused its explanation of the sentence almost entirely on

§ 3553(a)(1): the history and characteristics of the defendant."  *Id.* at 1249.

The government appealed, arguing that the sentence was substantively

unreasonable because it did not adequately reflect multiple § 3553(a) factors.

*Id.* at 1246–47.

This Court reversed, stating that "[a] district court should not rely

solely on one § 3553(a) factor without addressing other relevant factors."  *Id.*

at 1246.[19]  The Court concluded that "[t]he district court's failure to discuss

---

[19] Notably, the Court did not hold that the district court must address *all*
other § 3553(a) factors.

multiple Guidelines factors impedes our review and compels the conclusion the sentence is not substantively reasonable." *Id.* at 1249.

In sharp contrast to the district court in *Crosby*, the district court here did not focus on one § 3553(a) factor to the exclusion of others. The court discussed multiple relevant factors that led it to conclude a variant sentence was necessary. Furthermore, there were no facts in *Crosby* that materially differentiated Crosby's conduct from that of the typical defendant convicted of possession of child pornography. This Court noted that it had "previously suggested that when a major variance is at play, the district court proclaims a substantively reasonable sentence when it considers 'comparative data regarding the degree of' a defendant's mens rea and 'a thorough survey of sentences entered by federal courts for similar conduct.'" *Crosby*, 119 F.4th at 1251 (quoting *United States v. Lente*, 759 F.3d 1149, 1175 (10th Cir. 2014)). Thus, the Court concluded that the district court's failure to adequately consider § 3553(a)(6) "as well as its *failure to explain its reasoning* create[d] a facially unwarranted sentencing disparity[.]" *Id.* (emphasis added).

Here, the district court engaged in an expansive explanation of its reasoning for the sentence imposed, including that "[t]he facts of these two cases are unique" and "the circumstances of [the bank fraud] case fall far outside the heartland of those considered by the United States sentencing

guidelines for bank fraud." 3R.496.[20]  In its next breath, the court

"conclude[d] that a sentence within the guideline range is not sufficient to

support the goals of sentencing." *Id.*  Implicit in these comments, even

absent explicit reference to § 3553(a)(6), is that any disparity created by the

upward variance was warranted.  *See United States v. Villela*, 2024 WL

5199991, at *11 (10th Cir. 2024) (unpublished) ("Though the district court did

not clarify which statutory factors it was analyzing for each of its remarks, it

was not required to do so[.]").

Finally, Candelaria argues that the district court "did not consider the

available sentences set forth in the relevant guidelines, much less refer to

them in explaining its two decade variance as § 3553(a)(4) expects." Op. Br.

50.  Under § 3553(a)(4), a district court is required to consider "the kinds of

---

[20] Given this uniqueness, the court would have been hard-pressed to conduct
"a thorough survey of sentences entered by federal courts for similar
conduct." *Lente*, 759 F.3d at 1175.  And *Lente* does not hold that such a
survey is required for a variant sentence to be substantively reasonable.  For
his part, Candelaria does not cite to any factually similar cases.  Rather,
Candelaria posits that his 312-month sentence equates to an offense level 39
and CHC I, and notes, "[a]s a point of reference, the base offense level for
second degree murder is 38." Op. Br. 49.  He then asserts that "the court did
not, and likely cannot, explain how Candelaria's conduct and background
warranted a prison term greater than those who caused substantially greater
harm [or] were driven by a more malevolent mens rea …." *Id.*  This assertion
is at odds with the evidence before the district court, which established both
that J.H. was beaten to within an inch of his life and that the crime was
coldly premeditated by Candelaria.  In any event, even if Candelaria's crime
is less serious than second-degree murder, § 3553(a)(6) does not require that
the district court compare sentences for dissimilar offenses.

sentence and the sentencing range" provided for in the United States Sentencing Guidelines. Candelaria again cites to *Crosby*, which he says "criticized the sentencing court for not explaining why 'a sentence substantially lower than what the lowest possible Guideline range recommended was nonetheless appropriate.'" Op. Br. 51 (quoting *Crosby*, 119 F.4th at 1252). But such criticism has no place here.

Here, the district court correctly calculated the applicable guideline range of 46 to 57 months, noted that range on the record, and explicitly stated that it had "considered the sentencing guideline applications[.]" 3R.498. The court then immediately turned to providing a detailed explanation for its conclusion that "a sentence well outside the applicable guideline range" was warranted. *Id.* As discussed above, that explanation encompassed multiple § 3553(a) factors. Thus, unlike the sentencing court in *Crosby*, the court here adequately explained why a sentence substantially higher than the guideline range was appropriate.

Candelaria also notes that "*Crosby* used the guideline range minus the enhancements as the comparison point to question the district court's sentence" and suggests that "[h]ere, adding enhancements to the guideline range may be instructive." Op. Br. 52 (citing *Crosby*, 119 F.th at 1252). What he ignores is that *Crosby* engaged in that exercise because the district court had expressed a policy disagreement with those enhancements. *Crosby*,

119 F.4th at 1252. Thus, it was logical to fault the district court for failing to consider the guideline range without the enhancements and explain why that range was not sufficient.

There was no such policy disagreement with the Guidelines in this case. And the "enhancements" Candelaria suggests "adding" are instead a cross-reference to an entirely different guideline application, U.S.S.G. § 2A2.2 (Aggravated Assault). Op. Br. 52. According to Candelaria, "[t]he 'real conduct' the court found so distressing was the aggravated assault on [M.H.] and the severe bodily injury it caused." *Id.* Therefore, says Candelaria, "referring to the aggravated assault guidelines at sentencing makes sense." *Id.* Candelaria, however, cites no authority recommending, much less requiring, this approach.[21] The process in which the district court engaged— accurately calculating the applicable (not hypothetical) guideline range and

---

[21] Even engaging in the exercise Candelaria proposes does not help his cause. That is because the guideline most applicable to Candelaria's "real conduct" is § 2A2.1 (Attempted Murder); the evidence before the court having established that the perpetrator engaged in a premeditated attack on J.H. with the intent to kill him. The offense level for attempted murder where the victim sustained permanent or life-threatening bodily injury (as J.H. did here) is 37. U.S.S.G. § 2A2.1(a)(1) and (b)(1)(A). Using "the highest criminal history category," CHC VI, as Candelaria proposes (presumably because the district court found that CHC I understated his criminal history), Op. Br. 53, the corresponding guideline imprisonment range is 360 months to life. Even using CHC III, the guideline imprisonment range is 262 to 327 months. Candelaria was sentenced to 312 months' imprisonment, within that range.

considering that range in conjunction with the other relevant § 3553(a) factors—is what the law requires.

Because the district court's weighing of the § 3553(a) factors was not manifestly unreasonable and its sentence did not exceed the bounds of permissible choice, it was not substantively unreasonable. *See Barnes*, 890 F.3d at 915; *see also, e.g., Gross*, 44 F.4th at 1301, 1305 (affirming variance from 71-month top of guidelines range to 120-month statutory maximum based on criminal history); *United States v. Pinson*, 542 F.3d 822, 836, 837 (10th Cir. 2008) (affirming "unusually large" upward variance imposed because of the "district court's belief that [the defendant] posed a danger to the public," despite noting "some qualms" about the sentence on appeal). This Court should therefore affirm.

# CONCLUSION AND STATEMENT CONCERNING ORAL ARGUMENT

For the reasons stated above, this Court should affirm the district court's denial of Candelaria's motion to suppress and Candelaria's 26-year prison sentence.

The United States requests oral argument to address any questions the panel may have that are not adequately answered by the briefs.

Respectfully submitted,

HOLLAND S. KASTRIN
Acting United States Attorney

*s/ James R.W. Braun*

JAMES R.W. BRAUN
Assistant U.S. Attorney
201 Third Street NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274
james.braun@usdoj.gov

## <u>TYPE-VOLUME CERTIFICATION</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief contains 11,456 words. I relied on my word processor to obtain the count. My word processing software is Word 2016.

*s/ James R.W. Braun*
JAMES R.W. BRAUN
Assistant United States Attorney

## CERTIFICATE OF SERVICE AND DIGITAL SUBMISSION

I HEREBY CERTIFY that the foregoing brief was filed with the Clerk

of the Court for the United States Court of Appeals for the Tenth Circuit by

using the appellate CM/ECF system on March 7, 2025.

I ALSO CERTIFY that Amnda Skinner, attorney for Defendant-

Appellant Marc Candelaria, is a registered CM/ECF user, and that service

will be accomplished by the appellate CM/ECF system.

*s/ James R.W. Braun*
JAMES R.W. BRAUN
Assistant United States Attorney